Here you hear you hear this Honorable Appellate Court for the Second Judicial District is now back in session as soon as adjourned. Honorable Robert E. McClain, your assignment. Please be seated. The case on the Doctrine of Truth is at 16.086. In re Marriage of Clarice Schmidt, Petitioner Appellant and Ambulance Schmidt, Respondent 3. Honorable on behalf of the Petitioner Appellant, Mr. Michael G. DiDomenico. And on behalf of the Respondents Appellee, Ms. Michelle M. Joplin. Mr. DiDomenico, please proceed. Justice McClain, it may please the Court again, Michael D. Domenico for Clarice Schmidt, who joins us in court this morning. This case comes before the Court after a merits trial on my client's motion for declaratory judgment, which invalidated the party's postnuptial agreement. The Circuit Court tossed out the agreement, the theories of the parties by their actions after signing the agreement, specifically how they chose to pay their family expenses, manifested in an intent not to be bound by the agreement and thus rescinded it, in other words, an implied rescission theory. Not only is this conclusion wrong, it was not pled or otherwise argued by the other side of this case, nor did the Circuit Court allow my side of the case an opportunity to address it on the merits below. Is it sufficient that it wasn't raised vis-a-vis that it was wrong? I see it as two separate points, the latter being a threshold procedural issue. There's a case law that I've cited in the brief that suggests that rescission is a theory that must be pled or it's waived and that the Circuit Court has an obligation to protect parties from surprise and prejudice in order to ensure a fair hearing. I think both can be said on this threshold issue. I don't think it can be legitimately argued that the other side pled the theory. They pled something similar to it, but they didn't plead an implied rescission theory. When you say something similar, what are you referring to? Their argument that they called equity. Did that equity argument include an argument on rescission? No. One case that they cited did not include that, and effectively their equity argument was that the agreement became too unfair to enforce. Now, there's no case law that supports that theory. There's a case from this district called Mills that effectively invalidated that idea, that agreement based upon changed financial circumstances cannot become invalid. Did that affirmative defense in any way raise the issue of the post-contractual financial conduct given the family bills and all that stuff? Yes. Their theory and what the Circuit Court ultimately went with were based on the same operative facts. But to my way of thinking, the set of facts were how the parties paid their expenses. The other side of this case took it over here and said the agreement became too unfair to enforce. The Circuit Court did something materially different and said implied rescission, and so the contract is out. I see those two things as materially different, so much so that for the Court to substantively recast it and reinvent the argument prejudiced my client. Didn't give it an opportunity to make all the arguments on the merits that we otherwise are making in this appeal. I don't have any problem. I don't think this Court does with Circuit Courts engaging in sua sponte acts and thinking differently and thinking in a way that the lawyers are not presenting the case. But if I think if the judge is going to do that, if the judge is going to look at the evidence and say, I'm thinking about this in a different way, I think the better procedure is for the judge to say, lawyers, come in. This is how I'm thinking about the case. I know you're not thinking about it this way, but I'm thinking about it this way. And you write a brief, and you write a brief so we can all have an opportunity to be heard. I think that if the judge wants to act in a sua sponte way the way the Circuit Court did in this case, I think that's the fair procedure that should be employed. And maybe that's the better point of this threshold sort of procedural point. Either it has to be pled, and it was aired, and it wasn't pled, or the judge should have handled the way he was thinking about this in a different way by giving both parties an opportunity to respond on the merits. Because what you had in this case is my side of the case goes to the Court to pick up the opinion, and by the time you're done reading it, your jaw is on the floor because at the end of it you're like, oh, my gosh, where did this come from? Nobody argued this, and if they had argued it, I would have argued X, Y, and Z in retort. What would you have argued? What elements of rescission would you have contested? All of it. And let's just go right to the merits then. Number one is that the parties substantially performed all of the acts required by the agreements. Number one, the agreement was effectively one that allocated their assets. It put all of their assets together on one schedule and pushed them into two piles, and Clarice got one pile and Andrew got another pile. And spending money that was supposedly per pile was the intent of the parties at the time of the allocation, or was it the intent of the parties at the time of the allocation to, like Abbott and Costello, spread the two piles, one for Abbott and one Costello, and then Abbott would spend Costello's pile? I don't think that's what happened. As far as what their intentions were, their intentions were you get a pile, you get a pile. Whatever you do with your respective piles is up to you. But didn't she, didn't Clarice take over the Appleby's pile, or am I missing something? I think you're missing the point that both parties spent down from their piles to pay the family expenses. The testimony, the uncontroverted testimony against Judge McJoint found none of these facts were in dispute, that she paid college expenses for the children, she paid for their daughter's wedding reception, she paid for Andrew's rehab, she paid for credit card and life insurance payments, all legitimate family expenses. The idea that only her assets, that only Mr. Schmidt's, Andrew's, Mr. Schmidt's assets were spent down is not correct. That comes from a statement in the record where the judge found that Clarice's account, her substantial account, was still worth over $600,000. But as I pointed out in both of my briefs, that was from her reading from an account statement that was over two years old. When she actually read what her account was actually worth, it was $94,000, which was very similar to what Mr. Schmidt had in his account. So both parties paid substantially from their assets to pay for their family expenses. So you're basically arguing that the trial court's finding the fact on that particular issue is manifestly erroneous. That's correct, Your Honor. And it's right in the record where he's getting the $600,000. She was just reading an old account statement. I think the judge took that to mean that's what it actually is today, and that's just not the case. And I pointed out to the record citation where she testified as to the current value of the account. But as far as paying the family expenses, these two people agreed that this is how they would pay them. Mr. Schmidt's, a lot of the expenses were paid. Some of the expenses were paid from account 1608, which was the account allocated to Mr. Schmidt. But he put Clarice's name on the account so she could pay these expenses when he went to Mississippi for his inpatient rehabilitation. She was the one left with four children to feed, to pay their expenses. We had two in college. We had two in school. And she was left to pay those expenses. Did the appellee raise the issue of substantive unconscionability and disbelief? Yes, he did. And did the trial court ever make a ruling or findings thereon? No. The judge passed on the substantive unconscionability point in favor of his implied rescission theory. Therefore, you in your prayer asked for a reversal as opposed to a vacation and a remand for further findings. Is there some reason why you didn't seek a vacation and further findings or at least a judgment on the pleadings? Well, I addressed this issue. First of all, my prayer for relief asks for any other appropriate relief that this court deems appropriate. I addressed the unconscionability in the reply brief because it was raised as an alternative. Let's put it another way. Do you understand that if we agree with your basis on appeal, it isn't going to be a reversal anyway? It's going to be a vacation and a remand? Yeah, well, the judgment would be, I'm asking that the judgment invalidating the contract be reversed and that the agreement be held to be invalid. It had to be held to be valid. And how can we do that if supposedly the judge never made a ruling on one of the counts? I think that you can, I think that Your Honors can assess unconscionability in the first instance. It's a de novo consideration under the case law anyway. Do you understand your claim of fire? Because if we agree with the judge that your client loses, then we would end up finding that there is substantive unconscionability. Would you rather have the trial court judge make those findings? That's fair. That's a fair point, Your Honor. What, that you're playing with fire or that you'd rather have the judge make those findings? The latter. The latter. Okay. How is that a de novo? I mean, if we're looking at the actual issue of substantive unconscionability, how are we reviewing that de novo? Because wouldn't we review that finding? I mean, if the trial court had made a finding of substantive unconscionability, wouldn't we look at that as whether it was against the manifesto or the evidence? Some of the case law suggests that substantive unconscionability is reviewed de novo. When the facts are in dispute and you have to defer those factual findings, I think you get into the more deferential standard, like you're suggesting. But when it's uncontested, and here are just the terms of the agreement, the financial circumstances immediately following the agreement are not in dispute. So to the extent the case law defines de novo review as doing the work of the trial, not doing the work of the trial judge, but it's as if you are the trial judge in the first instance, I understand your point, Justice McClurin, that you still need some sort of ruling below to get to the de novo review, perhaps. But de novo review also means that you're acting as if you're the circuit court in the first instance and you're doing that work. But I want to back up on the unconscionability for one second because I don't even think that that is in play in this case. I don't think that substantive unconscionability is even an affirmative defense to the validity of the contract under the Vela case and under the Vela court's reasoning because this agreement was entered into expressly pursuant to Section 503A.4 of the Illinois Marriage and Dissolution of Marriage Act. Vela says that if the contract is valid under general contract principles, that unconscionability is not in play and the court is bound to accept the allocation of assets in the agreement regardless if it's conscionable or not. I saw Your Honor, Vela, and Justice McClurin 25 years ago almost to the day in the Vela case. So I don't think we even need, if we're talking about whether the judge has to even make it, it's not even legally part of this calculus because this was a 503A.4 agreement, not a 502 agreement. It was not intended upon a dissolution of marriage. It was not intended upon anything. It was these two people getting together to try to save their marriage after emotional circumstances happened the way they happened. They're all a record that I don't need to go into at this point. And that's what these two people decided to do. They cited the Vela case as controlling precedent for their agreement. They expressly cited that this was a 503A.4 agreement. And following this court's precedent, that agreement does not have to come, that does not, that agreement does not have to pass the 502 unconscionability test because it isn't a 502 agreement. So I don't even think unconscionability is even in play here to go down the road of remanding it for findings in the circuit court because as a matter of law, it just isn't. I don't have any other questions. Any questions? I'll restate the rest of my time, but I'll preach again. Ms. Jochner. Good morning, your honors. May it please the court. My name is Michelle Jochner, the law firm of Schiller, DuCanto, and Fleck, and I represent the appellee in this matter, Andrew Schmidt. I think we need to begin our analysis of this case with the fundamental principle of appellate review, that it is the correctness of the judgment of the circuit court that's on review before this honorable court. The judgment on review here is the circuit court's denial of Clarice's motion for declaratory judgment. The standard of review is that a grander denial of a request for declaratory judgment rests with the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. In turn, abuse of discretion has been defined as something that's clearly against logic, that there was arbitrary action on the part of the circuit court without employing any type of conscientious judgment. Now, in her reply brief and in her... Is it an abuse of discretion to sui spante raise a defense that wasn't raised? Your honor, we believe that that is not what occurred in this case, that the judge did not sui spante raise rescission. I'd like to then turn to the issue of what counsel said with respect to that. That there was surprise on the part of his client with respect to what the circuit court did. Now, it's our position that the record supports our contention that there was no surprise for prejudice based upon the defense and equity that was raised. Now, our basis for saying there was no surprise is that the pleadings put Clarice on notice that the defense and equity was at issue and that it was fully briefed and argued in the circuit court, and we set forth a long line of pleadings that show that Andrew alleged as part of his equity defense that the majority of liquid assets and funds that otherwise belonged to him and that were given to him solely as his own property under the agreement were substantially depleted by Clarice while she safeguarded her own assets. When was the first time the word rescission was ever uttered in this record? Rescission, that specific word was not. Until the trial broke through. Until the trial court's ruling. But Justice McLaren, you made the point, and I think that what happened here is that the agreement started with what's mine is mine and what's yours is yours. And it became through the party's conduct, which happened very shortly after the agreement was put into place prior to Andrew going to rehabilitation, it became what's mine is mine, and Andrew, what's yours now is ours, or maybe mine as well. So at the end of the conduct of the parties here, by the time that Andrew went into rehabilitation, which was about for five months that he was away in Mississippi, Mrs. Schmidt had total access over his accounts because he had put her name on his account that was solely awarded to him as part of the agreement. So now the agreement stated that once we divide the assets, they're the sole and separate property of each person, and each other weighs the right into those assets. Was there anything in the record stated or referencing either unclean hands or latches? No. No, Your Honor. But what was in the record and what was before the court in every pleading were the facts that underlie the rescission arguments. I don't think there's any doubt about that. I think counsel agreed with you on that point when you spoke a few minutes ago. Yes. The issue is whether or not you're looking at this set of operative facts as being argued for one defense or another defense, and whether the two are separate and have to remain separate. I mean, I'm going to quote you one of the last comments that trial counsel made, you know, from your side. And, Judge, I believe in any way you look at it, whether procedural, substantive, or equity argument, we'll put all those together, this agreement is unconscionable. It should be invalidated. So we're talking about, I understand the fairness argument as this whole equity argument is, but is it a fairness argument that was pinpointed toward unconscionability or a fairness argument that was pinpointed toward rescission? Your Honor, I think that it was a target at both because, of course, substantive unconscionability was specifically raised as one of the affirmative defenses. But I think that the equity argument encompassed the concept of rescission. So any equitable remedy was on the table? Any equitable defense was on the table? Well, I think that any equitable defense that fit within the facts, counsel in his brief to this court cites to a number of rescission cases at page 35, I mean, 36 of his brief. And we know that those cases are all factually in the posit, because in those cases, one party was prejudiced by reason of surprise. Now, the concept of eliminating surprise in a case animates Section 2-613D of the Code of Civil Procedure, which requires specifically that facts constituting any affirmative defense must be set forth in the pleadings. And that was satisfied here. Now, of course, rescission is a legal conclusion. It's a legal concept. But what matters here to us is that the facts which supported rescission were in evidence. And Section 2-613D tells us that very plainly, that that is pivotal here. Illinois is a fact-pleading state that requires parties to plead facts that lead to a legal conclusion. And here there was an eight-day hearing that the trial court presided over and was well aware of what was going on here. And admittedly, the equitable argument was very broad. It was. But it encompassed all of the facts that were necessary. And again, as I set forth in our brief, I set forth the long line of pleadings where both sides did have an opportunity to engage in discussion and debate about what their conduct meant in terms of the validity of the agreement. And Andrew consistently throughout all of those pleadings maintained that it was his assets, who were his sole assets under the agreement, became, went under the control of his wife at that time. And that she then ended up spending down all of his assets to the point that he had perhaps about $100,000 left or maybe less. And actually hers went up by $20,000. And I know that counsel has made this argument in their reply brief that while she only had $94,000 at the time of trial, but your honors need to understand that the trial was two years after she had filed for divorce. And during that time period, Mrs. Schmidt had gone through a series of attorneys, a number of different attorneys, and had paid hundreds of thousands of dollars in attorney's fees in that time. And we submit that the relevant time period is between January 2013 and January 2014 when she filed for divorce, which the circuit court itself said was only approximately 11 months after they had engaged and executed this agreement. Would you agree that that time period is irrelevant to substantive unconscionability? I'm sorry, your honor, which time period? That time period that you just referenced is irrelevant to substantive unconscionability. The time period subsequent to the filing of the dissolution action? No, no, no. Between the agreement and the filing. No, we believe that it still is relevant because when you look at substantive unconscionability, you look at the economic status of the parties after the agreement. And again, recall that the agreement as it was only lasted for a few weeks when they then decided amongst themselves, and both of them did. It was a two-way street here. They both decided that they were going to alter the agreement by Mrs. Schmidt having her name on Mr. Schmidt's account. So no longer, it was not his account any longer, his sole and separate property to which she waived any right, it was now their account. Again, it started out as what's mine is mine, what's yours is yours. It changed. What's mine is mine, what's yours is ours. At the end of this, Mr. Schmidt basically had nothing that was left in his sole name. Nothing. And that vitiates the agreement because the idea of the agreement was to separate their property. Well, it sounds like you're saying that there were several agreements or one agreement with several modifications, and that the end result or the last culmination of agreements or modifications was unconscionable. Am I misunderstanding your argument or not? I think that it can fairly be characterized that way, that they started out with one agreement. And with that agreement, if it hadn't been adulterated, would that have been unconscionable? Yes, Your Honor. Why? As the circuit court found in his ruling, he found that the agreement awarded Mrs. Schmidt at least 74% of the marital estate, and he found that it became more lopsided in favor of Mrs. Schmidt after it was executed, that he called it unfair, punitive. Well, that's my point. If it's 74, by the time we get somewhere down the line of time, it's now 80 or 84 or 86. So are you arguing that 74 is unconscionable as well as 86 or 84? Yes, because it's not only looking at the asset allocation, Your Honor. It's also looking at all of the other financial obligations that Mr. Schmidt bound himself to within that agreement. He was responsible for 100% of the mortgage on the marital home, which went completely to Mrs. Schmidt. She was given the marital home in the agreement. But regardless, he was responsible for 100% of the mortgage, which was about $207,000, plus all real estate taxes on the home and homeowners insurance, which was to be paid for him. He also was responsible to hold a life insurance policy in the amount of $1 million, with premiums of about $13,000 a year forever, until the end of his life. Also, Mrs. Schmidt was given an ongoing share of 50% of his retirement accounts, which also appears to be ongoing forever. She was given an Audi and an engagement ring that was not counted, and that was about $60,000 to $70,000, not counted in the agreement. And the agreement also says that she can have maintenance without any acknowledgement to a court about all of the assets that she received in this agreement. That was part of it, that saying that the court would have to turn a blind eye to what she received. I'm sure your client's age is in the record someplace, right? Yes. But I missed it. What is his age? He is, I want to say it's early 50s. And is his occupation in the record? I missed that also. His occupation is that he is, he's a businessman. So he's still working? He's still working, yes, he is. He still has prospective income? Yes. Thank you. Yes, he does. How do you respond to Petitioner's Counsel's argument that unconscionability, substantive unconscionability doesn't come into play under the law? Thank you, Justice Park. I appreciate the opportunity. In her reply, Mrs. Schmidt says that because the agreement expressly mentions Section 503A.4 of the IMDMA, it is not subject to an unconscionability analysis, and that this court must therefore accept it and is bound by it regardless of whether it is conscionable. Now, that is extreme, to say the least, and it's not supported in the case law. They cite the Vela case, and the Vela case for, I just want to quote the way that they cite the Vela case. And I quote, The court is bound to accept the allocation of marital and non-marital property rights regardless of whether the provisions were conscionable, and that's the end of the quote, based upon 503A.4. Well, Your Honor, the problem with that quote is that conscionability was never an issue in Vela at all. That was not an issue in that case. So that particular statement of what Vela stands for is incorrect because conscionability was never an issue. What was an issue, where it was an issue, conscionability in a post-marital agreement was an issue in intermarriage of Richardson, which we cite in our brief, and that's a 1992 First District case, and there a post-marital agreement was held to be unconscionable, and the parties disputed whether 503A.4 applied or 502B applied, and the court in Richardson said that prior to the determination of whether the agreement was contemplated to comport to Section 502 or 503A.4, the threshold question necessarily becomes whether we are dealing with a conscionable and therefore valid agreement. So essentially what counsel is doing is putting the proverbial cart before the horse because you have to have a valid agreement for it to fall under 503A.4, and 503A.4 is simply a recognition provision within the IMDMA that a valid, and I underscore valid, post-marital agreement can render property non-marital. Now, 503A.4 presumes that the agreement has been already determined to be valid, and I ask... Procedural unconscionability as opposed to substantial unconscionability? Your Honor, perhaps, but I think all of those fall within the same ambit of challenges to validity, and I would posit that just by virtue of this particular provision, including a specific requirement that the agreement be valid, that this indicates the intent of the legislature that courts always retain the authority to determine validity of the agreement, including whether they are conscionable. Otherwise, a statute would not contain this threshold requirement, and it would apply to any agreement. It would be surplusage to have that term valid within 503A.4, and I know that my time has expired, but I just would direct Your Honors to examine In Re Marriage of Richardson, which does directly address the argument that's made by counsel on this point and refutes it, and also to take a look at Bella and see that it has nothing to do with conscionability. All it had to do with was whether the agreement was enforceable, and we're not there yet because we're talking... In terms of substantive unconscionability, we're talking about whether it's valid or not. Okay. Thank you. Okay. Thank you, Your Honors. Thank you very much. Mr. D, Domenico. I disagree with the characterization of Bella as presented by counsel. You know, what happened in Bella was that the circuit court in that case concluded that the agreement at issue that was made in conjunction with a pending divorce and then they would abandon the divorce proceedings could not be enforced because it was made pursuant to 502, and because no court had ruled on its conscionability, and this court disagreed, and this court said it could be a 503-A4 agreement, and they reversed. This court reversed, and it found without delving into whether or not it was unconscionable or not, it reversed and said the agreement is valid. End of story. There was no discussion about unconscionability. Why? Because as a matter of legislative intent, 502 agreements are contingent upon the conscionability of the terms, but 503-A4 agreements are not. That's what this court held 25 years ago in Bella, and that's what these two people relied upon when they made their contract, and the validity of the agreement under 503-A4 only turned on general contractual principles, as Justice Burke, as you were alluding to. With respect to the dwindling of accounts and the timing and when was what, I'd like to pick up on what Justice Spence said. You know, Mr. Schmitz is the breadwinner of this family. This is a long marriage. He's earned a substantial amount of income. My client is a homemaker who raised four children. He's the one with the superior ability to make income now and in the future and always has been. He was the one that went off to rehabilitation in Mississippi, and after what she had learned about the double life that he was leading, 200 extramarital affairs behind her back that she knew nothing about, how did she know if he was going to come back from Mississippi rehabilitated or not? Well, how could she be faulted for paying the expenses from an account that he put her on to do so? In fact, the record contains an e-mail from Andrew where he voluntarily divided up his own account, I think when the divorce proceedings were just starting to get going in 2014, and he said, take this for the expenses. Why? Because he knows he needed to pay the family expenses, and that's how he agreed to do it. He was the only one that could have added queries to his account after the agreement was signed, and that was his choice to do so and his right to do so under the agreement. That doesn't result in a new agreement, or at the very least, it doesn't serve to vitiate this agreement's terms. Was there one agreement or were there several agreements? As to what we are seeking today, there's one agreement. What these two people did after the agreement, it is only my position this morning that it did not have the effect of the parties. Was there consideration for the modifications? I don't think there were modifications. I think these two people acted in accordance with the agreements. Counsel's position is that- I'm having a hard time conceptualizing the idea that if there's an agreement on the 1st of August and there are new parameters on the 1st of September, that it's the same agreement. I think your point proceeds from a premise that the agreement spoke to how they were going to pay their expenses. When it didn't, there's nothing in the agreement that says how the family expenses were going to get paid afterwards. How can we talk about deviating or changing the agreement to make a new agreement if there wasn't an agreement in the first place? That's not what this was, which is the point I wanted to emphasize in my opening brief, that the premise that the circuit court proceeds from is erroneous. This was an asset allocation agreement. It did not instruct how the parties were to pay their expenses after the agreement was signed. So how could either one of these people be charged with deviating or not following the terms of the agreement that aren't in there? I don't know of any case that stands for that proposition. Did it dispose of all assets? So at the conclusion, there were no other marital assets to speak of, just his inheritance? There was a catch-all, I think. There was a substantial amount of the assets were listed and then divided up, but then there was a catch-all, I think, for what may have been accumulated after the agreement was signed, and that was effectively left up to a court to decide. And that catch-all would have been about how much money? I think at the time of trial, if my memory serves from the schedules, the approximation was less than $100,000 in assets. But, again, if these two people had stayed married longer than what they did or filed for divorce much later, that would have been much more. But I think the attorney who wrote this built in a catch-all for what may be accumulated beyond what was in existence at the time that the contract was made. Normally when there's a rescission, the parties are supposed to be placed in the position they were in status quo ante. Was that ever attempted? No. No. The rescission came up when we got the decision and still remained in effect to have the trial court place the parties in status quo ante. That's what the case law says, generally speaking. There are exceptions to that, I know, but that's generally when you have a rescission in the commercial law cases, that is the object. And I don't know if the circuit court lost sight of that when it went off on its own in this theory. Your argument seems to be, at least to me, that in this particular instance, an unconscionability is not a factor to be weighed or a count to be considered in the enforcement of an agreement or a contract. That's correct. That seems to fly in the face of my years of experience that any contract is subject to fair dealing, good faith interaction, et cetera, which suggests that your argument seems flawed to me somehow. Is there any particular case other than Vella that you believe has what appears to me to be the blanket statement that unconscionability does not occur in this one instance that you referenced? No, no, Your Honor. I have no other case other than Vella that Your Honor wrote 25 years ago that these two people expressly referenced when they made this agreement. But to answer your question, the answer is unequivocal no. Okay. Very good. Thank you, Your Honor. Thank you. Thank you. The Court will take a recess. There are other cases on the call. They are the public leader. The rest is courts and administration.